Argued and submitted May 9, writ dismissed July 21, reconsideration denied October 4, 1994

STATE ex rel Frank A. HALL,
Director of the Oregon Department of Corrections,
and Manfred Maass, Superintendent of the
Oregon State Penitentiary,
*Plaintiffs-Relators,*

*v.*

R. William RIGGS,
Judge of the Court of Appeals
of the State of Oregon,
*Defendant,*

*and*

Donald Harold GRAHAM,
*Intervenor.*

(SC S40649)
877 P2d 56

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiffs-relators. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Lawrence Matasar of Hoffman & Matasar, Portland, argued the cause and filed the brief for defendant.

Donald H. Graham, intervenor *pro se*, filed a brief.

GILLETTE, J.

## GILLETTE, J.

This is an original mandamus proceeding in which relators, the Director of the Oregon Department of Corrections and the Superintendent of the Oregon State Penitentiary (hereafter collectively called "relators"), challenge the authority of the defendant judge, a judge of the Court of Appeals,[1] to enter an order that denied to the Department of Corrections the power to commit an inmate to a particular form of custody in a particular portion of the Oregon State Penitentiary (OSP) until after a hearing could be held. Because of a concern that the defendant judge may have exceeded either the jurisdiction or the statutory authority of the Court of Appeals, we issued an alternative writ of mandamus directing that the defendant judge either withdraw his order or show cause why he should not be required to do so. The defendant judge declined to withdraw his order. For the reasons that follow, we now conclude that the order of the defendant judge was one that lay within both the jurisdiction and the authority of the Court of Appeals to issue. We therefore dismiss the writ.

The first issue in this case is the jurisdictional one. Relators argue that the Court of Appeals had no subject matter jurisdiction in this case, which involves a final order of the Department of Corrections that purported to assign the inmate to the Intensive Management Unit (IMU) of OSP for administrative, as opposed to disciplinary, reasons. As we explain in more detail, *post*, the inmate has attempted to obtain judicial review of that order in the Court of Appeals pursuant to ORS 421.195, which provides:

> "If an order places an inmate in segregation or isolation status for more than seven days, institutionally transfers the inmate for disciplinary reasons or provides for nondeduction from the term of the sentence under ORS 421.120(1)(a) and (b), the order and the proceedings underlying the order are subject to review by the Court of Appeals upon petition to that court filed within 30 days of the order for which review is sought. The department shall transmit to the court the record of the proceeding, or, if the inmate agrees, a shortened

---

[1] Although the named defendant, the Honorable R. William Riggs, is a single judge of the Court of Appeals, it appears from the context that Judge Riggs was acting as a presiding judge in entering the order that is under scrutiny in this case.

record. A copy of the record transmitted shall be delivered to the inmate by the department. The court may affirm, reverse or remand the order on the same basis as provided in ORS 183.482. The filing of the petition shall not stay the department's order, but the department may do so, or the court may order a stay upon application on such terms as it deems proper."

The jurisdictional issue concerns the scope of the first clause of the first sentence of ORS 421.195, *viz*, "[i]f an order places an inmate in segregation or isolation status for more than seven days." In *Bagby v. OSP*, 118 Or App 421, 425, 847 P2d 898, *rev den* 317 Or 396 (1993), the Court of Appeals held that, when a custody reclassification occurs as the result of a disciplinary violation, a subsequent order transferring an inmate to IMU is subject to judicial review under ORS 421.195, because "[placing an inmate in] IMU is both an institutional transfer for disciplinary reasons *and* segregation and isolation status." (Emphasis in original.) Relators assert here that *Bagby* was wrongly decided and that, when correctly construed, ORS 421.195 provides no basis for jurisdiction in the Court of Appeals in cases like the present one. We examine that issue first because, if relators' argument is well taken, the Court of Appeals' order was made in the absence of subject matter jurisdiction.

The question is one of statutory interpretation. In interpreting a statute, this court's task is to determine the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Thus, our task in this case is to determine whether the legislature intended IMU transfer orders that are not made for disciplinary reasons to be subject to judicial review under ORS 421.195. In pursuing that inquiry, we begin with the text and context of the statute in question. *Id.* at 610-11. Context includes "other provisions of the same statute and other related statutes." *Id.* at 611.

As noted, by its terms ORS 421.195 provides for judicial review of an order that "places an inmate in segregation or isolation status for more than seven days, institutionally transfers the inmate for disciplinary reasons or provides for nondeduction from the term of the sentence under ORS 421.120 (1)(a) and (b)." OSP does not deny that

the inmate was placed in IMU by an "order," or that confinement in IMU can be characterized as "segregation or isolation status."[2] Thus, if the text is to be taken literally, the inmate is entitled to judicial review under ORS 421.195. Relators argue, however, that ORS 421.195 must be read in the context of the surrounding statutes. According to relators, ORS 421.195, when examined in context, "does not clearly reveal whether it was intended to authorize the Court of Appeals to review any non-disciplinary orders." We turn to that question.

We begin this exercise by noting that relators face an uphill fight. It is difficult to imagine wording much clearer than that utilized in the statute. That wording purports to authorize judicial review of a complete class — orders "plac-[ing] an inmate in segregation * * * for more than seven days." No mention is made of the *reason* for entering the order as somehow limiting the scope of the right of an inmate to judicial review.

Moreover, the next clause of the same sentence demonstrates that the legislature knows how to distinguish between reasons for an action when it wishes to do so. That clause subjects to judicial review only orders that "institutionally transfer[] the inmate *for disciplinary reasons.*" (Emphasis supplied.) Without question, the legislature by that provision recognized that institutional transfers could occur for different reasons, and it chose to subject to judicial review only one kind of transfer.

Finally, the third circumstance listed in the first sentence of the statute likewise illustrates the same point: Judicial review is to be available for orders "provid[ing] for nondeduction from the term of the sentence under ORS 421.120(1)(a) and (b)," both of which describe computation of various "good time" credits for inmates against their sentences. The statute that is referred to, ORS 421.120, contains several other subsections relating to computation of good time, ORS 421.120(1)(c) through (1)(g), and authorizes the Department of Corrections to develop rules for deduction of

---

[2] As noted by the Court of Appeals in its opinion in *Bagby v. OSP*, 118 Or App 421, 426, 847 P2d 898, *rev den* 317 Or 396 (1993), inmates in IMU are confined to single cells in which they are locked for over 23 hours per day.

each type of good time credit. ORS 421.120(1)(h). In distinguishing among various kinds of deductions of good time, the legislature once again demonstrated its ability to provide for judicial review of certain kinds of decisions within a broader category. The legislative choice to do that with respect to two types of orders listed in the first sentence of ORS 421.195, while making no mention of any subcategory within the third type, strongly suggests that there was no intention to limit judicial review only to some subcategory of the third type of order.

With the foregoing admonition concerning the clarity of the text of ORS 421.195 in mind, we turn to an examination of that statute's context. The context on which relators rely is the act by which ORS 421.195 became law: Oregon Laws 1973, chapter 621 ("the Act"). Four sections of that enactment are pertinent to our inquiry. We shall discuss each individually.

Section 1 of the Act amended ORS 183.310, the definitions section of the Administrative Procedures Act. More specifically, it amended the definition of "rule" in that statute by adding the following underlined portion to what was then subsection (7) of that statute:

> " 'Rule' means any agency directive, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency. The term includes the amendment or repeal of a prior rule, but does not include:

> "* * * * *

> "(e)   Rules of conduct for persons committed to the physical and legal custody of the [Department of Corrections], the violation of which will not result in:

> "(A)   Placement in segregation or isolation status in excess of seven days.

> "(B)   Institutional transfer or other transfer to secure confinement status for disciplinary reasons.

> "(C)   Noncertification to the Governor of a deduction from the term of his sentence under ORS 421.120.

"(D)   Disciplinary procedures adopted pursuant to section 4 of this 1973 Act[, now codified at ORS 421.120]."[3]

That section of the Act does not help relators. Instead, it again exhibits the striking differentiation in treatment between orders placing an inmate in segregation or isolation status for more than seven days — which category is not subdivided according to the reason for the placement — and institutional transfers — which category *is* subdivided along precisely those lines.

Relators rely specifically on section 4 of the Act, which was added to ORS chapter 421 by Oregon Laws 1973, chapter 621, section 3. (It now is codified, with certain amendments not pertinent to this proceeding, as ORS 421.180.) As enacted in 1973, it provided:

"The [Department of Corrections] shall adopt procedures to be utilized in *disciplining* persons committed to the physical and legal custody of the [Department]. The procedures adopted shall be subject to the approval of the Governor."

(Emphasis supplied.) Certainly, that section demonstrates that one concern leading the legislature to enact Oregon Laws 1973, chapter 621, was the disciplining of inmates. It does not demonstrate, however, that that topic was the *only* concern on the minds of the legislators. Other sections of that Act dealt with work release programs for inmates (Or Laws 1973, ch 621, § 8), provided for financing of a range of programs (Or Laws 1973, ch 621, § 9), and declared an emergency (Or Laws 1973, ch 621, § 10). Perhaps more important, however, there is no cross-reference from section 4 to indicate that it was intended to limit the apparently broader concept in the companion section, Oregon Laws 1973, chapter 621, section 7 — the section that became ORS 421.195.

Relators also rely specifically on section 6 of the Act (Or Laws 1973, ch 621, § 6). With one amendment not pertinent here, section 6 now is codified as ORS 421.190. As enacted, it provided:

"Evidence may be received at *disciplinary* hearings even though inadmissible under rules of evidence applicable to

---

[3] In 1977, the legislature deleted subparagraph (C). Or Laws 1977, ch 374, § 1. In 1979, paragraph (e) became paragraph (f). Or Laws 1979, ch 593, § 6. Finally, in 1981, subsection (7) was renumbered subsection (8). Or Laws 1981, ch 755, § 1.

court procedure and the [Department of Corrections] shall establish procedures to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to afford the inmate a reasonable opportunity for a fair hearing."

(Emphasis supplied.) Again, that section of the Act demonstrates that the legislature was concerned with prison discipline. The fact that section 6, together with sections 4 and 7 (which became ORS 421.195), all were enacted together and placed in ORS chapter 421 indicates that the legislature considered their subject matter to be related. But that does not demonstrate that the legislature considered all of the sections to be coextensive.

The statutes on which relators rely are a legislative recognition of the constitutional necessity of providing procedures within the Department of Corrections with respect to prison disciplinary proceedings. *See generally Bonney v. OSP*, 270 Or 79, 526 P2d 1020 (1974) (discussing due process requirements for prison inmates in light of (then) recently-enacted ORS 421.195 and its companion statutes). They do not, by their terms, create any ambiguity in the otherwise clear mandate of ORS 421.195.

It would have been easy for the legislature to choose to limit the scope of the right to judicial review under ORS 421.195 to disciplinary proceedings for which procedures were to be created. All it had to do was say that judicial review would be available from "an order that places an inmate in segregation or isolation status for more than seven days *for disciplinary reasons.*" As already noted, the legislature created, within the same sentence, exactly such a limitation concerning judicial review of orders that institutionally transfer inmates. But the choice concerning orders like the present one was otherwise: The statute speaks only in terms of "plac[ing] an inmate in segregation or isolation status for more than seven days." The linguistic difference in treatment of that kind of event should not be ignored, in the absence of some better demonstration than has been made here that there is a latent ambiguity with respect to it.

We conclude, from the plain language of the statute, and having due regard for its context, that ORS 421.195 means what it says: An inmate such as the one here who has

been placed in IMU for more than seven days is entitled to judicial review of the order that places him there.

We turn now to the question whether, although the Court of Appeals had subject matter jurisdiction over orders like the one for which judicial review was sought in this case, the defendant judge exceeded his authority in entering the specific order that he entered. In addressing that issue, the chronology in this case is all-important. We therefore set it out in some detail:

May 10, 1993 — Inmate Donald Graham[4] filed in the Court of Appeals a petition for judicial review of a "final order" (hereafter "Order No. 1") of the Department of Corrections assigning him to the Intensive Management Unit (IMU) at the Oregon State Penitentiary for a period in excess of seven days. (Order No. 1 issued on or about April 28, 1993.) In his petition, Graham asserted that ORS 421.195 provided the statutory basis for judicial review of the order that he was challenging.

July 14, 1993 — Graham filed in the Court of Appeals a motion to stay enforcement of Order No. 1.

July 29, 1993 — A new "IMU assignment request" (hereafter called "Order No. 2") was made and approved by the Department of Corrections, thereby purporting to supersede the original order placing Graham in IMU. On the same date, the Department filed notice with the Court of Appeals under ORAP 4.35(1)(b)[5] of

---

[4] Inmate Graham is an intervenor (and the real party in interest) in the present proceedings.

[5] ORAP 4.35(1)(b) provides:

"If an agency not subject to ORS 183.482(6) withdraws an order on judicial review for the purpose of reconsideration it shall file with the Administrator a copy of its order or other decision withdrawing that order, accompanied by a statement of reasons why the order is being withdrawn and a statement whether

its withdrawal of Order No. 1. The notice stated that "[t]he purpose of this action is to provide petitioner with a hearing in accordance with * * * recent [Court of Appeals'] decisions addressing IMU placements."[6]

August 2, 1993 — The Department issued a notice to Graham that it had withdrawn Order No. 1 and had issued a new assignment "order" (*i.e.*, the new IMU assignment request, Order No. 2). A copy of the new order was attached to the notice. The notice informed Graham that he was entitled to administrative review of his assignment to IMU. The notice further informed Graham of the Department's position that, "if ORS 421.195 applies to [the Department's] decision to assign you to the IMU, the decision does not become a final order for purposes of judicial review under ORS 421.195 until you have filed a request for administrative review and that request has been acted on by the Administrator."

August 11, 1993 — The Court of Appeals sent a letter to the Department asking whether Graham still was being held in IMU and, if so, under what authority.

August 30, 1993 — The Department responded to the court, informing the court that Graham continued to be housed in IMU under the authority of Order No. 2. The Department also informed the

the agency expects to submit a new order to the court following the withdrawal and, if so, when."

[6] By "hearing," the Department meant the opportunity to seek administrative review of the IMU assignment decision.

court of its position that "[the Department's] action assigning petitioner to IMU does not become final [for purposes of judicial review] until petitioner requests an administrative review and that review is completed." The Department suggested to the Court of Appeals that Graham's motion to stay Order No. 1 was moot and that, at a minimum, Graham "ought to be required to renew his motion for stay, directed at the current basis for his IMU assignment."

Sept. 7, 1993 — Graham replied to the Department's response, arguing that, because he remained in IMU, the original order had not, in fact, been withdrawn.

Sept. 23, 1993 — The defendant judge signed the order granting Graham's "motion to stay petitioner's placement in IMU," which order is the subject of the present proceeding.

Sept. 27, 1993 — Relators filed their petition for an alternative writ of mandamus in this court. Relators also sought a stay of the defendant judge's order, pending resolution of their request for an alternative writ. Three days later, this court granted the stay and, in due course, issued an alternative writ.

The foregoing detailed recitation of the procedural history of inmate Graham's assignment to IMU and of his attempt to challenge that confinement explains why this court was concerned that the defendant judge had acted incorrectly: The only case that was ever before the Court of Appeals arose out of Order No. 1. There is no question as to the authority of the Court of Appeals to stay *that* order. However, the Department of Corrections had purported to "withdraw" that order and had issued Order No. 2. If Order No. 1 actually had been withdrawn, Graham had obtained all

(as to that order) that he could have sought. There would be no order remaining for the Court of Appeals to review and, thus, no basis on which the Court of Appeals could act.[7]

It was suggested at oral argument that the Department of Corrections had no authority to withdraw Order No. 1, but we reject that suggestion. Our rule, ORAP 4.35(1)(b), set out at note 5, *supra*, is a recognition by this court of the straightforward proposition that, in the absence of some statutory provision that specifically limits the practice, it is important to permit administrative agencies to withdraw orders, rather than forcing an aggrieved party to pursue and a court to perform an exercise in judicial review that the agency already has recognized is unnecessary. The answer to this case turns on a less cosmic proposition than the suggestion that agencies somehow lack authority to recognize their own mistakes during a judicial review process and to correct those mistakes without judicial help. The answer lies in the fact that, in this case, the agency actually never has completely withdrawn Order No. 1.

An agency can withdraw an order completely. If it does, the judicial review proceeding is at an end. On the other hand, an agency can take the lesser step of withdrawing an order for the purposes of reconsidering it. As already noted, ORAP 4.35(1)(b), set out in full at note 5, *supra*, governs the withdrawal of agency orders "for reconsideration." Where withdrawal is pursuant to that rule, however, the rule contemplates that there will be further consideration by the agency *of that same order*, with the reviewing court then being informed as to the outcome of that further consideration. That is why the rule directs that the agency that withdraws its order inform the court in its notice of withdrawal "whether the agency expects to submit a new order to the court following the withdrawal and, if so, when."

---

[7] Assuming (without deciding) that Order No. 2 properly was subject to immediate judicial review in the Court of Appeals pursuant to ORS 421.195 or some other statutory provision, the record in this case does not reveal any petition for judicial review of that order. *See* ORAP 4.35(3) (after the agency's issuance of an order on reconsideration, the petitioner must file an amended petition for judicial review or a new petition for judicial review, or "the judicial review proceeding in the Court of Appeals will be dismissed").

■ We think that it necessarily follows from the foregoing description of the procedure involved that, where an order has been withdrawn only for reconsideration, rather than being withdrawn completely, the reviewing court retains jurisdiction over the judicial review proceeding concerning that order. And, because that is so, the wording that the agency used in withdrawing its order becomes pivotal to determining whether the judicial review proceeding remained viable. This brings us back to the notice of withdrawal filed by the Department of Corrections concerning Order No. 1.

■ As noted in the chronology set out *supra*, the Department of Corrections notified the Court of Appeals on July 29, 1993, that it was withdrawing Order No. 1. That notice stated in full:

> "Pursuant to ORAP 4.35(1)(b), respondent hereby gives notice of withdrawal of the administrative transfer request which resulted in petitioner's placement in the intensive management unit (IMU). The purpose of this action is to provide petitioner with a hearing in accordance with this court's recent decisions addressing IMU placements.
>
> "Respondent anticipates filing a revised order within 60 days."

The foregoing is a notice of withdrawal for reconsideration, not a notice of complete withdrawal. It follows that the Court of Appeals retained jurisdiction over the judicial review proceeding. That being the case, that court had authority to issue orders that appeared to that court, in the exercise of its discretion, to be necessary in order to manage the conduct of the proceeding before it. *See* ORS 1.010(5) (power of courts of justice to control the conduct of persons in matters before the court "in any manner connected with a judicial proceeding *before it*") (emphasis supplied). The Court of Appeals is solely a statutory court. *See* ORS 2.510 to 2.590 (establishing Court of Appeals and detailing its jurisdiction). Its areas of jurisdiction are, generally, granted by statute. But, as the emphasized wording in ORS 1.010(5) indicates, where that court has jurisdiction — as the record in this case shows that it did — its authority to act is clear.

Writ dismissed.